IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

ROBERT D. MADISON                                                  PLAINTIFF

                    v.                          Civil No. 12-3094

CAROLYN W. COLVIN[1], Commissioner
Social Security Administration                                     DEFENDANT

## MEMORANDUM OPINION

Plaintiff brings this action under 42 U.S.C. Sec 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits (DIB) and supplemental security income ("SSI) under Title II of the Social Security Act (Act), 42 U.S.C. Sec 423(d)(1)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See 42 U.S.C. S 405(g).*

**I.        Procedural Background:**

Plaintiff filed his application for DIB on July 11, 2008 and his application for SSI on October 29, 2008, alleging degenerative disc disease, osteoarthritis of the cervical and lumbar spine, internal derangement of the left knee, osteoarthritis of the left ankle status post chip fracture, obesity and mild mental retardation. (T. 13). Plaintiff's applications were denied initially on December 18, 2008 and on reconsideration on February 19, 2009. Plaintiff then requested an administrative hearing, which was held on June 23, 2010. Plaintiff was present and represented by counsel.

At the time of the administrative hearing, Plaintiff was 31 years old and had about a ninth

---

[1]Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

grade education.  (T. 33).  The Plaintiff had past relevant work ("PRW") as a logger.  (T. 62).

On April 4, 2011, the Administrative Law Judge ("ALJ") concluded that, although severe, Plaintiff's degenerative disc disease, osteoarthritis of the cervical and lumbar spine, internal derangement of the left knee, osteoarthritis of the left ankle status post chip fracture, obesity and mild mental retardation did not meet or equal any Appendix 1 listing.  (T. 13).  The ALJ found that Plaintiff maintained the residual functional capacity ("RFC") to perform sedentary work with additional restrictions.  (T. 15). With the assistance of a vocational expert, the ALJ then determined Plaintiff could perform the requirements of representative occupation such as a machine tender and a sedentary assembler.  (T. 21-22).

## II.    Applicable Law:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Id*.  As the court explains, "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision."  *Id.*  As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

2

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability has lasted at least one year and prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A).   The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. § § 423(d)(3), 1382(3)(c).   A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003).   Only if the final stage is reached does the fact finder consider the plaintiff's age, education and work experience in light  of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## III.   Discussion:

The ALJ determined that Plaintiff had severe impairments of degenerative disc disease, osetoarthritis of the cervical and lumbar spine, internal derangement of the left knee, osteoarthritis of the left ankle status post child fracture, obesity, and mild mental retardation.   T. at 12.   Plaintiff contends that the ALJ erred in three ways: (1) He failed to find that Plaintiff met the §12.05(c) mental retardation listing or its functional medical equivalent; (2) He failed to give specific substantial reasons for finding Plaintiff not credible regarding his subjective complaints of pain; and (3) He made no consideration of the effect that Plaintiff's pain would have on his ability to work,

3

failed to account for the findings of doctors who examined Plaintiff and failed to properly consider the GAF Assessments of Plaintiff.  T. at 11, 14, 16.

###### A.      Mental Retardation Finding

Plaintiff alleges that he suffers from mental retardation, which is described as a condition that is "characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning."   20 CFR Pt. 404, Subpt. P, App. 1.  In particular, Plaintiff alleges that his condition falls under subcategory (C), which requires the Plaintiff to show that he has "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 CFR Pt. 404, Subpt. P, App. 1.  The ALJ discussed the possible impairment under subcategory (C) as well as subcategories (A), (B), and (D).  T. 13-14.  He specifically ruled out subcategory (C) because Plaintiff did not have "a valid verbal, performance or full scale IQ of 60 through 70."  T. 13.

Plaintiff saw Dr. Stephen Nichols for an IQ and Mental Status Interview on October 14, 2010.  (T. 382).  Dr. Nichols administered the Weschler Adult Intelligence Scale (WAIS), 4th Edition, and the Computerized Assessment of Response Bias assessment.  The WAIS is an acceptable means to test for mental retardation.  *See Bailey v. Apfel*, 230 F.3d 1063, 1065 (8th Cir. 2000) (referring to predecessor test, the WAISR). Plaintiff did not demonstrate difficulty in following directions, such that the use of standardized measures of intellectual functioning was precluded as Dr. Stephen Nichols asked him a variety of questions regarding his knowledge and Plaintiff provided relevant answers.  T. 384;  20 CFR Pt. 404, Subpt. P, App. 1.  Dr. Nichols reported that Plaintiff's WAIS score was 48 and noted that the score placed Plaintiff "well below the 1st percentile of adults his age."  T. 385.  However, Dr. Nichols stated, "I do not consider these results

to be a reliable and valid measure of his current intellectual functioning." T. 385. He reported that

Plaintiff rubbed his forehead with his left hand and stated, "I g

et a headache when I have to think" and that Plaintiff continued to rub his forehead during the

administration of all ten sub-tests. T. 384. He also noted that Plaintiff refused to answer some

questions and simply shook his head rather than answer. T. 384. Regarding the Computerized

Assessment of Response Bias, Plaintiff answered 38.7 percent of questions correctly. T. 385. Again

Dr. Nichols questioned the validity of these results as he stated, "Individuals who score at this level

on the Computer Assessment of Response Bias are consciously determined to provide mostly

incorrect responses." T. 385. He also noted that the test was designed to be used with two hands

to mark the proper responses and that Plaintiff "kept his left hand on his forehead during the entire

test, thus making it awkward to respond with just one hand." T. 385. Dr. Nichols also stated, "One

can perform this poorly only by deliberately trying to give incorrect answer." T. 385. He further

stated that "just guessing at the task reveals higher scores than those obtained by Mr. Madison. This

low level of performance is never observed in samples of persons with significant brain injuries."

T. 385. Dr. Nichols summed up the validity of the scores by saying, "The claimant gave a very poor

effort to cooperate during the interview and testing. There were several signs of symptom

exaggeration." T. 386.

However, Dr. Nichols did note that he believed that the "score would remain in the

Extremely Low Range, even under circumstances in which he was highly motivated." T. 385. He

reiterated that he was unable to obtain a valid test result, but he said that he believed that Plaintiff

"meets the criteria for Mild Mental Retardation." T. 385. He made this diagnosis on the basis of

Plaintiff's poor educational history, lack of work skills and his subjective assessment of Plaintiff's

cognitive functioning during the interview and testing." T. 386. However, Plaintiff was seen by Dr. Vann A. Smith on March 26, 2009 and the same IQ test (WAIS) was administered as part of the Mental Residual Functional Capacity Questionnaire and the Plaintiff scored an 80 on the test at that time. T. 361. In the absence of any evidence of a change in a claimant's intellectual functioning, a person's IQ is presumed to remain stable over time. *See, e.g., Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001); *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir.1985) (absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir.1986) (claimant had low IQ during onset of disability in 1979 rather than just when first IQ tested in 1982); *Luckey v. Department of Health & Human Servs.,* 890 F.2d 666, 668-69 (4th Cir.1989) (ALJ may assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning). There is nothing in the record to indicate that Plaintiff's IQ was affected between the time of the first IQ test and that of the second. Because Dr. Nichols invalidated the test results and a higher score was obtained by the Plaintiff about a year before the invalid test, Plaintiff has not met his burden of proving that he has a valid score that meets the definition under 12.05(c) or any other subpart of that definition. 20 CFR Pt. 404, Subpt. P, App. 1.0.

The regulations allow a finding that a claimant equals a listing when his impairments or combination of impairments is of equal medical significance to the required criteria. 20 C.F.R. § 404.1526. Medical equivalence must be supported by medical findings; symptoms alone are insufficient. *See id.* (stating Social Security Ruling 86- 8. Section 404.1526(e) places "the responsibility for deciding medical equivalencies . . . with the [ALJ] or Appeals Council.")

Plaintiff contends that his impairments meet or equal the requirements of listing 12.05(C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C) (Mental Retardation). However, he acknowledges that the IQ scores that Dr. Nichols reported are not representative of his actual intelligence, but argues that it is "reasonable to infer that his actual IQ score is below 70." *See* Brief of Petitioner at 17. Plaintiff bases his argument on the aforementioned comment that Dr. Nichols made: "While I believe that this score represents an underestimate of Mr. Madison's intelligence, I believe that his score would remain in the Extremely Low Range." T. at 385. Furthermore, Plaintiff relies on the results of a mental evaluation that Dr. Nichols found unreliable due to malingering and exaggeration. T. 385-386. *See Johnson*, 390 F.3d at 1070 (noting that the ALJ appropriately took into consideration doctor's conclusion that Johnson had malingered and properly rejected IQ scores). Thus, Plaintiff has not proved that he met all the requirements of Listing 12.05(C) because there is no valid score within this range in the record. Dr. Nichols and Plaintiff both admit that the IQ scores are not reliable and not representative of Plaintiff's intelligence and cannot serve as evidence of an equivalent condition.

Furthermore, Plaintiff must first meet the listing's initial definition for mental retardation, which states, "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. While the "SSA has not explicitly defined 'deficits in adaptive functioning,'" it "does provide criteria" for assessing severity for other mental impairments and by section (D) of the listing 12.05. *Durden v. Astrue*, 586 F. Supp. 2d 828, 834 (S.D. Tex. 2008). These criteria include "adaptive activities of daily living," "social functioning," and "concentration, persistence

or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(c)(1)-(3). The ALJ specifically went through each of these categories. T. at 14. He stated that Plaintiff had "mild restriction" for activities of daily living because he had difficulty with "bending over and getting in and out of the bathtub," but that he was "able to shop and handle his finances." T. at 14. The ALJ said that Plaintiff experienced "moderate difficulties" in social functioning, noting that Plaintiff reported he spends time with others but is "unable to go fishing and hunting with friends anymore due to his pain." T. at 14. He also stated that Plaintiff's social interaction would be impaired by "his preoccupation with his pain" and "his low level of intelligence would hamper his ability to participate in social groups," citing the consultative examiner's report. T. at 14, 386. The ALJ also noted that Plaintiff has moderate difficulties in "regard to concentration, persistence or pace." T. at 14. He based this information on Plaintiff's function report and the consultative examiner's report. T. at 14. He stated, "Claimant reported that he does not finish what he starts, cannot pay attention for very long, can follow instructions fairly well and has difficulty in handling stress and changes in routine." T. at 14. He also stated that "the consultative examiner indicated the claimant's ability to cope with, concentrate on, and sustain persistence in completing tasks would be fair for simple tasks" and that Plaintiff had not experienced any episodes of decompensation. T. at 14. The ALJ properly considered Plaintiff's adaptive functioning and any applicable equivalency to the listings under 12.05. *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (noting ALJ properly considered that Plaintiff did not display significant limitations in adaptive functioning as required under Listing 12.05). In order for Plaintiff to qualify for benefits, he must show that his unlisted impairment, or a combination of impairments, is equivalent to a listed impairment by presenting "medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531.

8

Moreover, Plaintiff testified that he had two or three men working for him, took care of the timber and kept track of employees' pay while he worked for his grandfather, actions inconsistent with the definition set out in 12.05.

As Plaintiff failed to establish this criteria, the ALJ properly considered the evidence in the record and did not err by finding Plaintiff did not meet the listed criteria for 12.05 or an equivalent standard.

**B.     Credibility Determination**

Plaintiff next contends that the ALJ committed error by not properly addressing Plaintiff's subjective complaints. Plaintiff made numerous complaints of subjective pain, which the ALJ noted in his opinion. T. 15-16, 18. An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.*

The ALJ noted that Plaintiff reported "pain in his back, knees and ankle most of the time" and that Plaintiff stated that "sitting, standing, and walking cause pain." T. at 15. Plaintiff also

9

reported that he had trouble with his shoulders when he held his arms up "for very long," beginning approximately on Jan 10, 2009.  T. at 200.  Plaintiff stated that his back upper and lower pain was more constant, beginning about January 3, 2009, and that putting on his own boots is very painful. T. at 205.

### 1.    Medical Records

The ALJ noted that Plaintiff has had "little regular medical treatment in the past and very few ER visits."  T. at 16.  Most of the medical records that Plaintiff provided pertain to childhood ailments that are largely not related to his current conditions.  Plaintiff went to the Boone County Hospital when he was six years old on August 31, 1983 because he had a fever and sore throat and because he was vomiting.  T. at 315.  He again went to the same hospital on September 16, 1983 because he struck his head on a rock.  T. 316-317.  X-rays were performed on the skull and no fracture or sclerosis of the calvarium was found.  T. at 317.  However, "paranasal sinuses" were noted to be "subaximally developed." T. at 317.

Plaintiff suffered pneumonia and was admitted to the Boone County Hospital on November 24, 1985, for treatment and was discharged on November 28, 1985.  T. at 296.  He was seven years old at the time and was diagnosed with acute bilateral pneumonitis.  T. at 297.  The treating doctor stated that Plaintiff had been sick for one week prior to being admitted.  T. at 297.  One set of radiology results stated that there were "some increased markings in the posterior infra-hilar region on the lateral view" that were "most likely indicating minimal bronchopneumonia."  T. at 311. Radiology work was completed on November 27, 1985 during the stay and the chest was reported as "normal" and the lungs were "now clear and well expanded."  T. at 310.

Plaintiff visited the North Arkansas Medical Center Emergency Room on March 31, 1990 due to pain in the suprapubic area, but his urinalysis was clear.  T. at 318-319.   On May 12, 1994, Plaintiff fell when he was playing football and went to the North Arkansas Medical Center.  T. at 293.  He was given a cast and Tylenol for pain.  T. at 294.  On August 6, 1995, Plaintiff fell while playing basketball and injured his left wrist.  T. at 288.  The radiology report indicated that there was no fracture to the left wrist, nor was there a dislocation or deformity.  T. at 291.  However, an "unfused accessory ossicle or the tip of the ulnar styloid" was noted.  T. at 291.

Plaintiff sought treatment on February 19, 1996, after sustaining a laceration caused by a chainsaw.  T. at 284.  He received stitches.  T. at 285.  Radiology work was conducted on Plaintiff and no fracture or dislocation was found.  T. at 287.  However, the radiologist noted that there appeared to "be a medial soft tissue injury."  Plaintiff next returned to the Boone County Hospital on May 8, 1996, when he suffered a laceration to the right knee from a bicycle accident.  T. at 320. The knee function was deemed "normal" in the treating physician's report.  T. at 321.  On May 21, 1996, Plaintiff was in a motor vehicle accident.  T. at 280.  He told medical staff that he hit his brakes and went into a ditch and that he hit the steering wheel.  T. at 281.  He experienced sharp pain.  T. at 281.  He was instructed to apply a warm compress to the injured area and to take Tylenol and Advil for pain.  T. at 282.  He underwent an examination and the doctor found the heart and mediastinum to be normal and that there was no definite fracture or subluxation to the sternum.  T. at 283.  Plaintiff then went to the North Arkansas Medical Center on September 19, 1997, after falling off a slide the day before.  T. at 322.  X-rays were performed on Plaintiff's left hand and an "oblique undisplaced fracture of the mid-shaft of the third metacarpal" was noted.  T. at 324.

11

Plaintiff visited the North Arkansas Regional Medical Center on May 8, 2003, after he reported that he had sustained an eye injury on the job. T. at 275. Medical staff were able to remove residual rusting from the eye and provided Plaintiff with eye ointment, pain medication and an eyepatch. T. at 275, 278. He was instructed to keep the eyepatch on until an eye doctor saw him. T. at 279. Plaintiff went to the North Arkansas Regional Medical Center for another work-related accident on April 22, 2005, because Plaintiff had cut his left index finger on a chainsaw. T. at 271-272. The injury had caused a V-shaped laceration. T. at 272. Plaintiff was instructed to clean the wound at least twice daily with antibacterial soap. T. at 273.

Plaintiff was sent to the Harrison Family Practice Clinic on December 11, 2008 as part of his disability determination. T. at 325. Dr. Brownfield made the following abnormal findings regarding joint motions: Knees Flexion: 0 - 120 degrees; Ankles Dorsiflexion: 0 - 10 degrees; Ankles Plantar Flexion: 0 - 20 degrees; Cervical Spine Flexion: 0 - 40 degrees; Cervical Spine Extension: 0 - 40 degrees; Cervical Spine Rotation: 0 - 60 degrees; Lumbar Spine Flexion: 0 -75 degrees. T. at 329. Dr. Brownfield also noted diminished ability to walk on heel and toes and squat/rise from a squatting position. T. at 330. He noted mild paralumbar muscle spasms. T. at 330. Additionally, Dr. Brownfield found that Plaintiff was moderately limited in maintaining prolonged positions and moderately to severely limited in kneeling, stooping and lifting. T. at 331. The ALJ also noted that Dr. Brownfield also completed X-rays of the cervical spine which "indicated loss of curvature with moderate to severe osteoarthritis and degenerative disc disease going down the spine." T. at 17. He also stated that "X-rays of the left knee revealed positive free body consistent with cartilage tear" and "X-rays of the left ankle indicated an old chip fracture/calcified positive for osteoarthritis," resulting

in Dr. Brownfield's diagnosis of "low back and neck pain consistent with degenerative disc disease." T. at 17.

Plaintiff went to the North Arkansas Regional Medical Center on March 1, 2010, complaining of neck and back pain. T. at 365. He affirmed that the pain was the result of a log that had fallen on him two years prior. T. at 367. X-rays were conducted and no "acute subluxation, dislocation, fracture or loss of alignment" was identified. T. at 370. However, "mild scoliosis without acute abnormality" was identified. T. at 370. He was prescribed muscle relaxants. T. at 373. Mr. Madison also visited the North Arkansas Regional Medical Center on June 16, 2010, reporting that he felt a "shocking pain like somebody stabbing you." T. at 374. Again, radiology work was completed and it was noted that there was "early osteophyte formation off the superior endplate of L4" and "early degenerative changes." T. at 376. However, "no acute abnormalities" were identified. T. at 376. The ALJ noted that this last visit occurred within days of the oral hearing. T. at 17.

Plaintiff was sent to Dr. Ted Honghiran on November 17, 2010 for an Orthopedic Examination and Report through the SSA. Dr. Honghiran stated that the x-rays of the cervical spine showed evidence of degenerative disc disease of the cervical spine at the C5-C6 level but otherwise appeared normal. T. at 392. Dr. Honghiran noted that the examination of the lumbar spine showed that Plaintiff is able to walk normally and has no limp. T. at 391. Dr. Honghiran also noted that Plaintiff does not have problems with dressing or undressing. The doctor found an abnormal joint motion in the Lumbar Flexion at 60 degrees with 25 degrees of side bending with no pain. T. at 390-391. Dr. Honghiran also found that Plaintiff has "negative straight leg raise in both legs" and that "his cervical spine examination is completely normal." T. at 392. Dr. Honghiran stated: "It is my

13

impression that this gentleman has a history of having chronic neck and back pain from degenerative disk disease condition in both cervical and lumbosacral spine." He also noted that Plaintiff had "no signs of neurological deficits" and "no muscle atrophy." He further surmised that Plaintiff "will continue to have pain depending on his activities."

Plaintiff indicated on his Questionnaire for Pain and Other Symptoms that he experiences pain in his back between his shoulders and in his lower back. T. at 175. He also stated that his knees ache "all the time." T. at 175. He said that the pain lasts for hours and he experiences pain or other symptoms most of the time. T. at 175. He reports that he can stand and walk for about 30 minutes before feeling pain and can sit for 15 to 30 minutes before experiencing pain. T. at 175. He reports that he takes two pills of Advil every hour. T. at 176.

The ALJ noted that although Plaintiff alleged he stopped working in 2006 due to upper and lower back, knees and ankle problems and that he had problems since 2009 with holding his arms up, he only reported taking Advil for pain. T. at 15, 172. *Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir. 2001) (concluding that an ALJ may reasonably discredit a claimant's testimony about disabling pain when the claimant takes nothing stronger than over-the-counter medications to alleviate her symptoms); *See also Hepp v. Astrue*, 511 F.3d 798, 807 (8th Cir. 2008) (moderate, over-the-counter medication for pain does not support allegations of disabling pain). A claimant's allegations of disabling pain may be discredited under the third Polaski factor by evidence that the claimant has received minimum medical treatment and/or has taken medications for pain only on an occasional basis. *See Cline v. Sullivan*, 939 F.2d 560, 568 (8th Cir. 1991) (citing *Williams v. Bowen*, 790 F.2d 713 (8th Cir. 1986).

14

The ALJ also noted that it did not appear "that the claimant has tried to obtain care through a free clinic or has had frequent ER visits indicating exacerbation of symptoms." T. at 16.  It is true that, "[w]hile not dispositive, a failure to seek treatment may indicate the relative seriousness fo a medical problem." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).  Plaintiff contends that he has not sought treatment due to lack of money.   While economic justifications for the lack of treatment can be relevant to a determination of disability, Plaintiff has not provided any evidence that he made attempts to procure treatment.  *See Clark v. Shalala*, 828, 831 (8th Cir. 1994) (affirming ALJ's credibility determination when "claimant offered no testimony or other evidence that she had been denied further treatment or access to prescription pain medicine on account of financial constraints."); *See also Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992).  The ALJ also noted repeated references to Plaintiff's smoking habit that was continued even though Plaintiff alleged he had no money for medical care.  T. 15.

Although Plaintiff alleges that he was pinned by a tree in a logging accident, Plaintiff stated that he did not seek treatment and that he was the type who did not visit the doctor unless he had to. T. 16.  *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8rh Cir. 1997) (failure to seek medical assistance contradicts subjective complaints).  Further, Plaintiff did not seek medical treatment between April 2005 until 2010, the year of his hearing, although his alleged onset date was December 31, 2006. T. 271, 365; *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (plaintiff's encounters with doctors appeared to be linked primarily to obtain benefits, rather than to obtain medical treatment).

## 2.    Daily Activities

In Plaintiff's Function Report, Plaintiff stated that he does not do much any more and that he usually stays in the house watching television.  T. at 177.  He cares for his children on weekends.

15

T. at 177.  He also reports that his conditions affect his sleep.  T. at 178.  Plaintiff contends that he can tend to most of his personal care by himself, but he needs help with getting his boots on and can't get out of the bathtub so he takes a shower T. at 178.  He reports that his girlfriend with whom he lives does the housework and most of the yard work.  T. at 180.  He states that if he goes outside it is usually just on the porch and that he only drives short distances.  T. at 180.  He does occasional shopping and is able to pay bills, count change and handle a savings account.  T. at 180.  He discloses that he used to go hunting and fishing but that he is now not able to walk to do those things. T. at 181.  He also reports that he talks daily with others and does not have problems getting along with others.  T. at 181-182.  However, he states that his ability to get along with authority figures is "not good."  T. at 183.  He also notes that he is more temperamental, has no patience and is afraid of not being able to do things with his kids.  T. at 183.  He says that he cannot pay attention for long and that his ability to follow written or spoken instructions is fair.  T. at 182.

While Plaintiff alleged that this injury resulted in his inability to work, the ALJ found that Plaintiff stopped working because he worked for his grandfather and his grandfather died.  T. 12. Plaintiff also maintains that he does not complete household work or yard work, stating that his girlfriend performs this work, not that he is not able to do so himself.  T. 180.  Additionally, Plaintiff is able to care for his children on the weekends, drive occasionally and go to the store.  T. 177-181. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive and sometimes go to the store).  Furthermore, there is ample evidence that Plaintiff malingered during a test, presumably to impact his test results to make him qualify for benefits.  T. at 384-386.

As the Eighth Circuit Court of Appeals explains, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th

16

Cir. 2003).   As explained above, the ALJ did discuss the Polaski factors of the claimant's daily activities, the duration, frequency and intensity of pain, the dosage, effectiveness, and side effects of medication the precipitating and aggravating factors, and functional restrictions as required.  The ALJ correctly discounted the subjective complaints of disabling pain.

### C.     RFC

Plaintiff contends that the ALJ erred in his determination of Plaintiff's RFC to perform sedentary work.  Specifically, Plaintiff contends that the ALJ erred in not accounting for doctors' opinions regarding Plaintiff's pain, not considering the effect Plaintiff's pain would have on his ability to work and failing to consider the GAF assessments in the record.

### 1.     Doctors' Opinions and Accounting for Plaintiff's Pain

RFC is the most a person can do despite that person's limitations.   20 C.F.R. § 404.1545(a)(1).  It is defined as the individuals' maximum remaining ability to do sustained work activity in an ordinary work setting "on a regular and continuing basis."  20 C.F.R. § § 404.1545 and 416.945; Social Security Ruling (SSR) 96-8p (1996).  It is assessed using all relevant evidence in the record.  *Id*.  This evidence includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.   20 C.F.R. § 404.1545(a)(3).

It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.  *Roberts v. Apfel*, 223 F.3d 466, 469 (8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has stated that a "claimant's

residual functional capacity is a medical question." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that "addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart* , 353 F.3d 646 (8th Cir. 2003).

Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Cox v. Astrue*, 495 F.3d 614, 619 (citing *Lauer v. Apfel*, 245 F.3d 700 704); *Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree.") Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. 20 C.F.R. § § 416.927(e)(2), 416.946 (2006).

The ALJ obtained a Physical RFC Assessment from Dr. Jim Takach on December 16, 2008. Dr. Takach opined that Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk at least two hours in a workday and sit about six hours in a workday. T. at 336. He determined that Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl and never climb ladders, ropes or scaffolds. T. at 337. Furthermore, he found that Plaintiff should avoid any moderate exposure to hazards like machinery or heights. T. at 339. Ultimately, Dr. Takach concluded that Plaintiff could perform sedentary work. T. at 336. Dr. Takach's opinion was affirmed as written by Dr. Jerry Mann on February 11, 2009. T. at 353.

18

Plaintiff was sent to Dr. Shannon Brownfield at the state agency's direction on December 11, 2008.  T. at 327.  He received a general physical, as well as X-rays of his cervical spine, knee and ankle.  T. at 325.  The findings are noted above.  The ALJ specifically noted the results of the examination, stating that "Dr. Brownfield diagnosed the claimant with low back and neck pain consistent with degenerative disk disease/osteoarthritis; left knee pain, probable meniscal type tear; and left ankle pain, status post injury with osteoarthritis.  T. at 17.  The ALJ also noted that Dr. Brownfield assessed Plaintiff with limitations that were moderate for prolonged posture and moderate to severe for kneeling, stooping and lifting.  T. at 17.

Additionally, the ALJ had a consultative evaluation performed by a Board Certified Orthopaedist, Dr. Ted Honghiran on November 17, 2010.  T. at 391.  Dr. Honghiran obtained his own x-rays of the cervical spine.  T. at 387.  Dr. Honghiran found that Plaintiff was "able to walk normally," had no limp, and had "negative straight leg raise in both legs."  T. at 391-392.  Additionally, Dr. Honghiran found that Plaintiff's lumbar spine showed a flexion to 60 degrees with 25 degrees of side bending with no pain and that Plaintiff had normal reflex and sensation.  T. at 391.  Dr. Honghiran noted that Plaintiff's "cervical spine examination is completely normal" and that x-rays showed evidence of degenerative disk disease of the cervical spine at C5-C6 level.  T. at 392.  Dr. Honghiran mentioned Plaintiff's medical records from his June 2010 visit which showed evidence of early degenerative changes of the lower lumbar spine.  T. at 392.  He concluded that Plaintiff "has a history of having chronic neck and back pain from degenerative disk disease condition in both cervical and lumbosacaral spine."  T. at 392.  He stated that Plaintiff "will continue to have pain depending on his activities" and noted that it would be "somewhat difficult" for him

19

to perform his previous work of logging.  T. at 392.  The ALJ also summarized this information in his opinion.  T. at 18.

After discussing Plaintiff's visits to these doctors and his responses on disability determination forms, the ALJ stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that Plaintiff's statements regarding the "intensity, persistence and limiting effects" of the symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment.  T. at 19.  The ALJ concluded that based on Plaintiff's "impairments, related symptoms, pain, and fatigue, it is reasonable to conclude that he would be unable to perform work at any greater level than the above residual functional capacity."  T. at 19.  The ALJ also noted that he agreed with the opinions of the state agency medical consultants that Plaintiff is "limited to sedentary work" with additional limitations.  T. at 20.  He also noted that the limitations assessed by Dr. Brownfield and Dr. Honghiran are "not inconsistent with the performance of sedentary work as set out in the above residual functional capacity."  T. at 20.  The ALJ stated that Plaintiff "apparently stopped working because he was working for his grandfather and his grandfather died, and not because he became too disabled to continue working."  T. at 20.  He concluded that although Plaintiff is limited by his impairments, he is not "totally disabled and unable to perform work at a level consistent with the above residual functional capacity."  T. at 20.

Additionally, the ALJ proposed the following question to the Vocational Expert:

Assume a hypothetical individual, the same age, education, past work as the claimant who is limited to sedentary work as defined by the Social Security regulations. Further, limited to only occasionally climbing ramps, stairs; never climbing ladders, ropes, scaffolds; occasional balancing, stooping, kneeling crouching crawling. Assume the individual must avoid even moderate exposure to hazards; so no work

20

at unprotected heights.  No work around dangerous moving machinery.  No driving as part of work . . . Are there sedentary-level jobs that would accommodate those . . . that are unskilled in nature?  T. at 62-63.

The VE stated that there were jobs of that nature, specifically "machine tender," "sedentary unskilled assembly jobs" and "simple inspector jobs."  T. at 63.  These limitations aligned with the RFC in the record.  T. at 336.  The ALJ further inquired, "What impact would additional limitations of no climbing at all; no kneeling, crouching, crawling have on those jobs?"  T. at 63.  The VE stated that the limitations would have no impact on the jobs she named.  T. at 63.  The ALJ asked if having no overhead work would impact those jobs and she responded that they would not.  T. at 63-64.  The original question and the follow-up questions encompass all of the relevant information in the RFC of record.  T. at 335-342.  Accordingly, this court finds that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing other work as machine tender or in a sedentary unskilled assembly job.  T. at 63; *See Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

Based on the record as a whole and the ALJ's careful consideration of all relevant factors, the court finds that the ALJ properly assessed the Plaintiff's Residual Functional Capacity.

### 2.      GAF Scores

Plaintiff also contends that the ALJ erred in failing to properly consider the global assessment of functioning ("GAF") assessments in the record in a manner that is consistent with Eighth Circuit precedent.  Dr. Nichols assessed Plaintiff with a GAF of 35 on October 14, 2010 T. at 386.  Dr. Vann Smith assessed Plaintiff with a GAF of 30 on March 26, 2009.  T. at 354.  However, a GAF score is not determinative for Social Security purposes.  The Social Security Administration has explained

that "[t]he GAF scale, which is described in the DSM-III-R (and the DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorder listings." 65 Fed. Reg. 50746-765 (Aug. 21, 2000), *cited in Jones v. Astrue* (8th Cir. Aug. 31, 2010) (Commissioner declined to endorse the GAF scales to evaluate Social Security claims because the scales do not have a direct correlation to the severity requirements in mental disorder listings); *see also Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002 (GAF score not essential to the RFC's accuracy). While the GAF score may not be determinative, it may still be relevant. *See Pates-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009).

The ALJ acknowledged Plaintiff's GAF scores of 30 and 35, but stated in his opinion that "the undersigned does not find the GAF to be a reliable measure of functional ability as GAF scores reveal only a picture in time and do not necessarily correlate with disability." T. at 20. He also stated that the scores were subject to change "from one day to the next" and that they are based in part on non-psychological issues. T. at 20. He stated that the score may go up if a claimant got a job or go down if a claimant had a financial setback. T. at 20. He also noted that the GAF is divided into "sub-components of psychological, social and occupational impairments" and that the "score does not identify the weight of the occupational sub-component. T. at 20. He concluded that "while the scores would be useful in tracking the effectiveness of mental health treatment, they would not be of as much significance in determining disability." T. at 20.

When Plaintiff's attorney asked the vocational expert what the vocational impact of a GAF of 30 would be, she responded that "an individual is unable to work with a GAF of 30." The Eighth Circuit has stated that "[a] GAF of 31 to 40 reflects a major impairment in several areas such as

22

work, family, relations, judgement or mood." *Conklin v. Astrue*, 360 F. App'x 704, 707 (8th Cir. 2010); Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders (DSM–IV–TR)*. Further, the Eighth Circuit has held that "GAF scores at 50 or below, taken as a whole, indicate [claimants have] serious symptoms . . . or any serious impairment in social, occupational or school functioning." *Pate-Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009).

And, we have reversed cases in which low GAF scores were not considered by the ALJ. *Wright v. Astrue*, 2012 WL 4955205 (W.D. Ark. 2012) (finding that ALJ did not properly evaluate Plaintiff's low GAF scores when he did not analyze GAF scores by one physician in the record and "only briefly discussed" Plaintiff's other GAF scores that resulted in the ALJ's finding that "[w]hile GAF scores are a useful tool in managing an individual's care and treatment, they provide a picture of current functioning and can vary widely from day to day as indicated by claimant's scores" and did not "lend them significant weight in arriving at a decision" in claimant's case). Other courts have also determined that an ALJ's conclusion that a GAF score is not a statement about a claimant's ability to work is in *direct conflict* with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. *Rice v. Astrue*, 2010 WL 3417803 (E.D. Ark. 2010).

However, the GAF score is but one piece of evidence. And the ALJ cannot discount a medical opinion solely on the GAF score. *CF. Jones v. Astrue*, 619 F.3d 963, 973-74 (8th Cir. 2010). Instead, this score is usually considered along with other evidence in the record. *See Wright v. Astrue*, 489 F.App'x 147, 149 (8th Cir. 2012) (finding ALJ's failure to reference claimant's GAF score did not require reversal when he completed a "a comprehensive analysis of the medical evidence, the infrequency of the GAF scores, the range of GAF scores, " the claimant's conflicting activities and conflicting medical evidence); *see also Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th

Cir. 2006) ("The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."); *see* 20 C.F.R. § 416.945.  Furthermore, a "decision to discount the GAF scores is within the ALJ's decision."  *Parker v. Astrue*, 6:10-CV-03275-NKL, 2011 WL 839653 (W.D. Mo. Mar. 7, 2011).  As this court has explained, "[w]hile the GAF system provides insight into a claimant's overall level of functioning, it is by no means dispositive on the issue of disability and must be considered in conjunction with other medical evidence."  *Stewart ex rel. J.L.M. v. Astrue*, 2:11-CV-02203-JRM, 2013 WL 252749 (W.D. Ark. Jan. 23, 2013).

Further, we note that Dr. Nichols's assessment of Plaintiff was unreliable, due o exaggeration/malingering, and we find that Dr. Smith's assessment is not entitled to significant weight given that it is not supported by the overall record.  It is clear to the undersigned that the ALJ carefully reviewed all medical evidence in the record, Plaintiff's activities and Plaintiff's subjective complaints regarding his pain.  And, we find substantial evidence in the record to support the ALJ's RFC determination.

## IV. Conclusion:

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

24

Dated this 13th day of December 2013.

**s/** *J. Marschewski*

HON. JAMES R. MARSCHEWSKI

CHIEF UNITED STATES MAGISTRATE JUDGE